## MURRAY v. GRAHAM *et al.*

1. **Promissory note :** SURETIES.   When a note is negotiated before due, without knowledge on the part of the person taking it that some of those purporting to be makers are in fact but sureties, they will, as to him, be regarded as principals.

2. ——ALTERATION OF INSTRUMENTS : ACTION.   While the material alteration of a note by the holder thereof, though made without any fraudulent intent, but for the purpose of making it conform to the real intention of the parties, will destroy the right of recovery on the note, it will not, it seems, prevent a recovery in an action for the debt.

3. —— ALTERATION BY CO-MAKER.   The alteration of a promissory note in a material respect by one of several makers thereof, assuming to have authority so to do, and for the honest purpose of making it conform to the original intention of the parties without the express, though with the implied, assent of the holder, will not prevent a recovery by the latter against all the makers in an action declaring upon the note as though in the form originally delivered.

*Appeal from Dallas Circuit Court.*

WEDNESDAY, AUGUST 31.

THIS action is brought to recover $7,000 against Graham and eight others.   The *first* count in the petition declares upon a note, signed by eight of the defendants, dated June 12, 1869, due in five months, payable to the ninth defendant (Van Meter), for $7,000, "with interest at the rate of ten per cent," and indorsed to the plaintiff on the same day.   The *second* count avers that the note, when transferred to plaintiff, contained the words " after matuity," (as to the interest), and that before it was due, Graham, who claimed to have, and it is alleged had, authority to act for all the other defendants, erased the same, but without plaintiff's knowledge or consent ; and to make the same conform to the real contract, etc. ; and judg-

ment is prayed as though the note read as when originally delivered. The *third* count is for money loaned to defendants, through their agent, Graham, at their request, for his and their use.

The answer of Graham admits the execution of the note, but pleads a want of consideration in part, and usury. The other defendants set up that they are sureties ; that the note is not theirs, because it was made in blank as to date, amount, time of maturity and payment, and handed to Graham, who was to fill the blank with, not to exceed $5,000, make it payable at a certain bank named, and use the money for a particular purpose ; that he violated his instructions and agreement, etc., of all which plaintiff had notice. They also say it is not their instrument, because it had been altered since its negotiation to plaintiff, with his knowledge and without their consent. It is further averred that the note was made by the " Corn Valley Railroad Co." as principal, and the other defendants as sureties, of which plaintiff had notice, and of the purpose of making the same as above set out (being in blank), and that they are discharged, etc. They also plead that the contract with plaintiff was usurious.

Trial to the court ; judgment in favor of all the defendants except Graham, and against him for $7,000 ; and plaintiff appeals.

*T. R. North* and *Nourse & Kauffman* for the appellant.

*Polk & Hubbell* and *E. Willard* for the appellees.

WRIGHT, J. — In this case, as in the one immediately preceding (*Davis* v. *Graham and others*), the parties

1. PROMISSORY NOTE: sureties.

differ but little as to the law, but do widely as to the facts. We shall state what, in our opinion, the testimony very conclusively establishes, what the court below could only consistently have found, and,

as we proceed, finally, state the law applicable to such facts.

Plaintiff let Graham have $7,000 in money, as a loan, for five months. It is true a large part was in a certificate of deposit for gold in a bank at San Francisco, but it had a cash value ; he took it at this value, and no more : and to the parties, and for this transaction, it served all the purposes of money.

The note itself called for interest at ten per cent, but there was an agreement, at the time of the loan, that plaintiff was to receive interest at the rate of two per cent per month. The contract was hence usurious, and there can be no recovery beyond the principal sum loaned, without either interest or costs. Rev. § 1790. This proposition is scarcely controverted, and hence need not be further noticed.

When the note was signed by the defendants it was a mere printed blank, there being neither date, payee, time of maturity, nor amount, but there was a place of payment— Citizen's Bank of Des Moines "—and this was not changed. Graham first signed it, and procured the other signatures and indorsement. There was some talk as to the amount for which the note was to be made, and as to when it would probably be negotiated, but of all this plaintiff had no knowledge whatever. The note was intrusted to Graham, and he filled the blanks and obtained the money, and in doing this he violated no agreement made with his co-defendants, certainly none of which plaintiff had the least notice.

Graham was the active party in making this loan, but all were alike principals, he acting for all. But, if by possibility, as between themselves, his co-defendants were sureties, plaintiff took the note ignorant of this fact, and, as to him, all our principals. Explanation is here necessary.

The corporation known as the "Corn Valley Railroad Company," was organized to build a road from a certain point to, and perhaps through, the town of Adell, where most of these defendants reside.   All of them were more or less interested in the construction ; some of them subscribed to its stock, some were officers, and all deemed the work important.   Graham was the president, and at that time in the full tide of prosperity as a banker.   He was the active man in this enterprise and seemed to be untiring in his efforts.   As he was the man of means (so regarded,) and had facilities beyond his neighbors for negotiating with others, whose aid was deemed essential, he was largely trusted, and his opinions and advice accepted almost unchallenged.   Indeed, every one seems to have reposed in him the most unlimited. confidence. To secure the road it was deemed important to obtain certain large tracts of land, valued at some $50,000, near the town and, which could be used in the contract for construction, as was believed, at great profit.   To do this certain advance payments had to be made.   They could not realize on subscriptions, and a loan was deemed advisable and, indeed, necessary.   This money was borrowed for this purpose, and so applied ; Graham taking the deed in his own name, as a matter of convenience, but treating the loan, the investment, and the whole transaction at the time, as for the benefit of the corporation. That the enterprise failed ; that he afterwards made sales, deeds and mortgages of this property on his own account and as his own property, does not change the essential fact, that when this loan was made it was for their joint benefit, and to accomplish their joint purpose. Nor does the fact that these co-defendants understood themselves to be sureties affect their legal relation to the transaction.   The investment was regarded as necessary, if not desirable, at the time and for the purpose of the

Murray v. Graham.

present inquiry their liability must be measured by their relation then to the transaction (assuming that plaintiff knew all the facts), and not by circumstances since transpiring, alike unexpected, and to some extent unfortunate, to plaintiff as well as these defendants. And when we go one step further, and remark that if plaintiff had any knowledge of what the money was raised for and how it was to be used, it was part of these facts above enumerated, and in legal strictness of none other, all difficulty as to the alleged suretyship is out of the way. And it hence follows, that all the defendants would be alike liable for the money borrowed (but not, as to plaintiff, as sureties of the railroad company, for to support this theory there is scarcely a semblance of proof), unless the right to recover thereupon is defeated by the alleged alteration of the note. And to this question and the effect of such alteration we now come. First as to the facts.

Money, at the time of this loan, was worth at least ten per cent, and the defendants did not expect it would be 2. —alteration made for less. When the blank note was of instrument: action. signed, but little attention was given to its language, no one *observing* whether the interest was to commence from its date or maturity; but it was well understood that interest would have to be paid from date, whether it was added to the principal up to maturity, and the aggregate amount named as principal to bear interest after due, or whether the amount borrowed was made to bear interest from date. Between plaintiff and Graham it was intended that the note should draw interest from date, and the words "after maturity," being in the printed form, were not observed; nor did either discover them until a few days before the note matured. Plaintiff made his home with his father, having returned a short time prior from California, where he had

been eight or ten years. His father was with him at the time the loan was negotiated, and took part in arranging its terms. Within a few days after the note was made plaintiff went on a visit to Ohio, leaving the note with his father, and did not return for near four months. After his return, he and his father, in looking at the note, observed these words ("after maturity,") and it was suggested that they were there by mistake, and would or might be corrected. Soon after this, and before the note was due, the father went to Adell (he and his son lived in the country), called on Graham, asked him if it was not the intention that the note should draw ten per cent from date. He replied that it was ; that he thought it did. The note was then produced. He was asked if he had "authority to right it." He answered he thought he had. Both were holding and looking at it, when Graham took a pen and drew a line through the words "after maturity." The son was not present and knew nothing of the erasure at the time. He knew that the father contemplated or talked of having this correction made, and made no objection, nor did he after the alteration, of which he was advised very soon afterward. The other defendants had no knowledge of this act until after suit was commenced, or about that time (November 22, 1869 ;) nor did they ever consent or ratify the same. Plaintiff never, in words, authorized the father to procure the alteration, and the father acted more upon his own suggestion than that of the son. Neither party intended any usury. There was no intent to injure or defraud. Graham believed he had the right to make the note conform to the intention of the parties, erased the words for this and no other purpose, and both father and son were entirely innocent of any intention to injure any one at the time.

Under these circumstances, what are the legal rights

of the parties? We answer, in the first place, that whatever the effect of the alteration upon plaintiff's right to recover upon the note, it cannot defeat his remedy upon the original consideration against all those to whom the loan was made. The alleged tampering with the note was certainly not fraudulent in fact, if in law even, and did not extinguish the debt. To prevent this tampering, the law may not allow the parties to fall back upon the contract as it originally was. *Wood* v. *Steel*, 6 Wall. 80. But this relates to the note — the written contract — and not to a recovery for the consideration. Here there is no pretense that the alteration was in fact the fraudulent act of the creditor, and the consideration of the contract is therefore unaffected. 2 Parsons' Notes and B. 571.

But the more material inquiry, perhaps, is, whether defendants are still bound in law upon the note. Can plaintiff fall back upon the note as it was before the erasure?

3. —— alteration by co-maker.

If the payee, however honest his motives, had, by his own act undertaken to make this erasure, there would be little doubt as to its effect upon his rights. The policy of the law is, that the contract shall be kept entire and unmutilated — to thus the more certainly secure its integrity — and especially as against the act of the payee or holder, without stopping to enquire whether there has been actual inquiry or fraud. *Hall's Admrs.* v. *McHenry*, 19 Iowa, 521, and cases there cited.

The general doctrine is, that an alteration of a note in a material part, after execution, made by one claiming a benefit under it, destroys the same as to him. Upon the instrument his right of action is gone. That this alteration in this case was material is, of course, most apparent, and is not denied. An alteration, however, by accident, mistake, or the act of a stranger, will not destroy or extinguish the instrument. But the holder would have

no right, upon the assumption that he was but making the instrument conform to the real intention, to change it in a material part, and claim that, because he acted from honest motives, it was but a *mistake*, and that he should still be allowed to enforce the contract. This is allowable, according to some cases, when there is *ambiguity* which may be explained by parol; but it would be a most dangerous rule to allow the payee, at his will and pleasure, to undertake, by writing or erasure, to correct, without the consent of the debtor or the order of a court, a mistake in drawing the paper or instrument which he holds.

Our opinion also is, that as plaintiff, after knowing that the alteration was made, brought suit upon the note in its changed condition, and claimed the benefit of it, he thereby admitted that it was made with his consent, though he was not present at the time of the erasure. But this implies, and is to be taken, as an admission only that he consented to it under the circumstances disclosed. And what are these? As already shown, one of the makers, upon his motion, claiming to have authority to do so for all, drew his pen through the words. To this plaintiff yielded no express assent. All that can be claimed is, that he impliedly assented. There was no collusion, no fraud, no intention to injure. His assent was given because of the maker's representation of his authority. There was a mistake, as to the payee, of fact, not of law. Suppose any one of these defendants had come to him, called his attention to the real contract, to these words, and stated that he was authorized to make the correction, producing a power of attorney to that effect, and that thereupon the erasure was made. It afterward turned out that the alleged power, without the knowledge of the attorney, in fact, was a forgery. Will any one claim, the plaintiff having acted in the

utmost good faith, that the instrument was thereby destroyed? And can the rule possibly be any different, where, while he is most reasonably and properly making inquiries as to the alleged mistake, one of the makers, assuming authority for all, voluntarily does the same thing? The act is in no just sense that of the plaintiff. He should not be affected by it otherwise than though it was the act of a stranger, or a spoliation by accident or mistake.

We know not that any case can be found like this in its facts. In principle, however, it seems to us that the rule is clear enough. As was said in *United States* v. *Spaulding*, 2 Maine, 476, " a doctrine so repugnant to common sense and justice, which inflicts on an innocent party all the losses occasioned by mistake, by accident, or *by the wrongful act of third persons*, ought to have the unequivocal support of unbroken authority before a court is bound to surrender its judgment to what deserves no better name than a technical quibble." If this act is founded upon a mistake of fact, and not *wrongful*, there would, of course, be much less reason for visiting the innocent party with the consequences claimed by defendants. Then, again, Mr. Parsons (2 N. and B. 570 ), speaking of the right of a party to return an instrument to its original form, after alteration, and then maintain his claim under it as if it had never been altered, uses this language : " If the alteration was made fraudulently, or with illegal intention, or if the original terms. cannot certainly be restored, or if any party has become interested in the note or affected by it, or related to it, since the alteration, in such a way that the restoration will do any wrong to that party—in either of the cases we should say the party must abide by the alteration he made, and accept the consequences of making it. But, unless one of these reasons existed, we are not aware of any

good and sufficient argument for refusing to permit him to restore the instrument to its original form and force." The argument of the learned author it will be seen, goes beyond what is necessary to sustain the ruling in this case. For here the alteration was made by one of 'he makers —as he believed under proper authority—and without the procurement, though, it may be admitted, with the knowledge of plaintiff. If they were both mistaken as to the power, and they acted in good faith, what argument is there against restoring "the instrument to its original form and force ?" We can conceive of none entitled to weight.

And we are thus brought to the conclusion, giving to the testimony the most favorable view for the defendants, that the law is with plaintiff, and that the court below erred in its judgment. More especially is this so, when we remark that there is at least fair ground for holding, upon the evidence, that Graham did, in fact, have authority to make the alteration of which his co-defendants now complain. Upon this aspect of the case, however, we will not dwell, as upon the other points we are clear that the case should be *reversed* and remanded for trial *de novo.* It is accordingly so ordered.

Reversed.